IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 5:21-CR-408 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM |
| AQUILEO PEREZ-PINEDA, | ) | |
| | ) | |
| Defendant. | ) | |

Now comes the United States of America, by and through its counsel, Michelle M. Baeppler, Acting United States Attorney, and Kevin P. Pierce, Assistant United States Attorney, and hereby files the Government's Sentencing Memorandum.

The United States requests that the Court sentence Aquileo Perez-Pineda ("the Defendant") to a period of incarceration within the guideline range as outlined in the plea agreement. The United States bases that request on the following:

## I. **PROCEDURAL HISTORY**

On May 27, 2021, a federal grand jury indicted the Defendant charging him for conspiring with others to distribute manufacture methamphetamine in the Northern District of Ohio ("NDOH"). (R. 1: Indictment). On October 29, 2021, the Defendant changed his plea, entered a plea of guilty, and signed a plea agreement. (R. 23: Plea Agreement).

The Court continued pre-trial detention, referred the case to the United States Probation Office ("USPO") for preparation of a Presentence Investigation Report. Then, the Court set sentencing for February 15, 2022 at 10:00 p.m.

1

**II.  FACTUAL BASIS**

Beginning at least early as January 2018 and continuing through at least March 2018, the Defendant, and others, namely, Jesus Cota Medina, Tyrone Rogers, Deon Johnson, Michelle Dailey, Joseph Terlizzi, Gilbert Treviso-Garcia, Hector Manuel Ramos-Nevarez, and Shauheen Sohrabi conspired to manufacture and possess with intent to distribute large quantities of methamphetamine for resale in the Northern District of Ohio.

As part of the conspiracy, each codefendant played a significant role in furthering the criminal conspiracy:

- Johnson, while incarcerated, organized, orchestrated, and planned to distribute methamphetamine in the Northern District of Ohio, by making phone calls to various co-conspirators, including Rogers, Dailey, Cota Medina, Sohrabi, and others.

- Dailey and Rogers traveled from the NDOH to Mexico for the express purpose of creating a drug trafficking chain of supply, organized by Cota Medina and Johnson. Dailey and others, taking direction from Johnson, instructed Rogers and others on how to execute drug trafficking activities in the NDOH.

- Sohrabi helped to arrange for the coconspirators to obtain access to and use residences and hotel accommodations located in the NDOH, in which Defendant, Treviso-Garcia, and other coconspirators from Mexico would stay.

- Sohrabi helped to arrange for the coconspirators to obtain access to and use commercial spaces (including a warehouse on Page Road in Aurora, Ohio and a warehouse on Olde 8 Road in Hudson, Ohio) to make crystal methamphetamine and prepare it for sale.

- Defendant and Treviso-Garcia traveled to the NDOH for the express purpose of helping to make methamphetamine for sale, to transport cash drug proceeds back to Mexico, and

to periodically inform the drug traffickers in Mexico that had sent them to Ohio on their progress towards that goal.

- Rogers, Terlizzi, and others distributed narcotics on behalf of the drug trafficking organization (DTO). Rogers, Dailey, and others, used numerous vehicles, including rental cars, for the purpose of transporting and distributing narcotics without law enforcement detection.

- From time to time, Rogers drove the Defendant, Ramos-Nevarez and Treviso-Garcia between the place they were staying (either the LaQuinta Inn and Suites in Macedonia, Ohio or an apartment in Aurora, Ohio) and one of the warehouses so that Defendant, Ramos-Nevarez and Treviso-Garcia could check in on and assist in the methamphetamine-manufacturing process.

- From time to time, Rogers and others wired money to Cota Medina and his nominees in Mexico.

- From time to time, Rogers spoke with his coconspirators on mobile telephones, including through the encrypted messaging application WhatsApp, to arrange for the production and distribution of crystal methamphetamine.

- From time to time, Treviso-Garcia reported to Cota Medina on the process of manufacturing crystal methamphetamine using WhatsApp.

In furtherance of said conspiracy, the above co-conspirators and the Defendant committed the following overt acts:

- In January 2018, Rogers and Dailey traveled from Cleveland, Ohio to Tucson, Arizona.

- On or about January 12, 2018, Rogers and Dailey traveled to Mexico from Arizona. While there, Dailey met with Cota Medina and others, and Johnson and Cota Medina spoke on the phone about narcotics shipments to the NDOH.

- Rogers and Dailey crossed back into the United States on January 12, 2018 at the Nogales West Border Crossing in Nogales, Arizona. Dailey drove a rented vehicle.

- On or about March 8, 2018, Treviso-Garcia entered the United States at the Nogales, Arizona Port of Entry from Mexico on a visitor's visa. Treviso-Garcia indicated his intended destination was Las Vegas, Nevada, but instead ultimately traveled to the NDOH to join the coconspirators.

- In or around March 2018, Mexican national coconspirators traveled to the NDOH in a tractor-trailer truck, carrying liquid methamphetamine that had been smuggled over the U.S.-Mexico border and that was delivered to the Page Road warehouse to begin manufacturing crystal methamphetamine. The Defendant operated the manufacturing process with the assistance of Ramos-Nevarez and Treviso-Garcia.

- In or around March 2018, when the DTO determined that they could not continue to manufacture the methamphetamine at the Page Road warehouse, Sohrabi obtained access to the Olde 8 Road warehouse, which he controlled, for the coconspirators to continue their operations. Defendant, Ramos-Nevarez and Treviso-Garcia moved the methamphetamine and equipment for manufacturing the methamphetamine from the Page Road warehouse to the Olde 8 Road warehouse, where they continued to manufacture methamphetamine.

- On or about March 24, 2018, Defendant and his codefendants knowingly and jointly possessed in the Olde 8 Road warehouse approximately 63 kilograms of methamphetamine, in both liquid and crystal form, which Defendant knew was a controlled

substance intended for distribution, as well as tools used to "cook," or manufacture, crystal methamphetamine.

- On or about March 24, 2018, in executing two separate search warrants at the Olde 8 Road warehouse, members of the DEA surreptitiously seized the approximately 63 kilograms of crystal methamphetamine there. After, Rogers and others discovered that a large quantity of drugs had been taken in the first search in the early morning hours, they did not know who had taken them. Rogers, Johnson, Dailey, Treviso-Garcia, Cota Medina, and others spoke incessantly on the 24th about who may have taken the drugs, and who was responsible.

## III. APPLICABLE LEGAL STANDARDS

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guideline range." *Gall v. United States*, 552 U.S. 38, 49 (2007). Appellate courts must review a district court's sentence for procedural and substantive reasonableness. *Id.* at 51. Although the Guidelines are advisory, appellate courts may apply a presumption of reasonableness to a sentence that falls within the Guideline range. *Id.*

Therefore, the Guidelines are indispensable for assuring appropriate and uniform punishment for federal criminal offenses. In crafting the guidelines, the Sentencing has the "capacity courts lack to 'base its determination on empirical data and national experience, guided by a professional staff with appropriate expertise.'" *Kimbrough v. United States*, 552 U.S. 85, 109 (2007). After determining the appropriate Guidelines range, the Court then turns to the familiar factors set forth in 18 U.S.C. § 3553(a).

## IV. CRIMINAL HISTORY AND SENTENCING GUIDELINE COMPUTATIONS

Upon review of the Defendant's PSR (R.25: PSR), the government concurs with the United States Probation Office's calculation of the Defendant's guidelines. Based on the

conviction in Count 1 and the parties' agreement that the amount of drugs attributable to Defendant is approximately 63 kilograms of methamphetamine the base offense level is 38. The Defendant received two additional points, under U.S.S.G. § 2D1.1(b)(5), for manufacturing methamphetamine, but received three levels acceptance of responsibility, under U.S.S.G. § 3E1.1.

| *Drug Trafficking (all counts grouped): 21 U.S.C. §§ 841(a)(1), 843, and 846* | | |
|---|---|---|
| *Base Offense Level* | **38** | § 2D1.1(c)(1) |
| *Manufacturing/Importing Methamphetamine* | **+2** | § 2D1.1(b)(5) |
| *Acceptance of Responsibility* | **-3** | See USSG §3E1.1. |
| *Total Level* | **37** | |

The United States, based on the Defendant's convictions, also concurs that the Defendant has 3 criminal history points and is Criminal History Category II. As a result, the Defendant's final guideline range is 235 months to 293 months of incarceration.

## V. APPLICATION OF § 3553(a) FACTORS

### A. NATURE AND CIRCUMSTANCES OF THE OFFENSE

*First*, the nature and circumstances of the offense support a sentence within the advisory guidelines range. Here, the Defendant and others Mexican national coconspirators traveled to the Northern District Ohio in a tractor-trailer truck, carrying liquid methamphetamine that had been smuggled over the U.S.–Mexico border. Once they arrived in Ohio, the Defendant dictated the manufacturing process with the assistance of Ramos-Nevarez and Treviso-Garcia.

The Defendant, Ramos-Nevarez and Treviso-Garcia then moved the methamphetamine and equipment for manufacturing the methamphetamine from the Page Road warehouse to the Olde 8 Road warehouse, where they continued to manufacture methamphetamine prior to its seizure.

The lack of conventional injury in the instant matter does not make the Defendant's behavior benign. In essence, drug trafficking is a crime of violence. The illegal sale of a controlled substance is surrounded by violence. Drug traffickers are known to keep large amounts of cash on hand, carry firearms to protect their assets, and are targets for robberies and home invasions. Further, Mexican cartels are known to impose violence on competitors, conspirators, and debtors. For example, in the instant case, co-defendants, after learning of the seized methamphetamine, were given a "green light" to kill co-defendant Shauheen Sohrabi, who they believed stole the seized methamphetamine. (1:18CR182, R. 18: Superseding Indictment, PageID 117-118).

Currently, drugs, guns, and violence strangle the city of Cleveland. Drugs tear down the fabric of a community, person-by-person, sale-by-sale. The people of Cleveland must be protected from this type of behavior. In order for Cleveland to thrive, repeat high-level drug traffickers, like the Defendant, cannot be tolerated and must be punished accordingly.

### B. HISTORY AND CHARACTERISTICS OF THE DEFENDANT

*Second,* the history and characteristics of the Defendant warrant a sentence within the advisory guidelines range. The Defendant's convictions do not arise out of a brief episode of criminal conduct involving multiple drug sales. To the contrary, these deliveries represent a routine, long-standing course of conduct built up over years. The Defendant, a trusted methamphetamine cook, now stands before the court as a repeat felon convicted of manufacturing millions of dollars of methamphetamine.

When arrested on these charges, the Defendant was serving a 70-month sentence[1] in North Carolina for manufacturing methamphetamine in a similar fashion.[2] In that case, investigators seized a semi-tractor trial with $90.8 million worth of liquid methamphetamine secreted in the driver's side fuel tank:[3]



In total, there were 120 gallons of liquid methamphetamine in the tank, which, could be converted into approximately 454 kilograms of crystal methamphetamine.[4] When arrested, DEA agents observed hoses protruding from a residential rear window leading to the driver's side fuel tank of the semi-tractor trailer. The Defendant was arrested inside the residence. (*Id*.) Therefore,

---

[1] The instant case occurred prior to the Defendant's arrest in North Carolina.

[2] CBS-WNCT, May 20, 2018, *UPDATE: Judge upholds $3 million bonds following $90 million meth seizure*, last accessed February 11, 2022, https://www.wnct.com/news/update-judge-upholds-3-million-bonds-following-90-million-meth-seizure/

[3] *Id.*

[4] *Id.*

the history and characteristics of the Defendant, a repeat offender, warrant a sentence within the advisory guidelines range.

### C. NEED FOR THE SENTENCE IMPOSED TO REFLECT THE SERIOUSNESS OF THE OFFENSE, TO PROMOTE RESPECT FOR THE LAW, TO PROVIDE JUST PUNISHMENT, AND TO AFFORD ADEQUATE DETERRENCE

*Third*, a sentence within the advisory guideline range reflects the seriousness of the offense. The Defendant's crimes are brash and show an extreme indifference to the consequences of his actions. The Defendant imported staggering quantities of methamphetamine from Mexico to the United States to be manufactured and resold. He and others used semi-tractor trailers, false gas tanks, and syphoning methods to deliver the liquid methamphetamine to warehouses to complete the manufacturing process. In other words, the Defendant committed his crimes openly, often in public or while travelling across country, undeterred by the possibility of detection. Therefore, the seriousness of this offense dictates that the Court impose a sentence within the advisory guideline range.

## VI. CONCLUSION

For the foregoing reasons, the government requests that this Court impose a sentence of within the advisory guidelines range as outlined in this memorandum.

Respectfully submitted,

BRIDGET M. BRENNAN
United States Attorney

/s/Kevin P. Pierce
Kevin P. Pierce (PA: 312492)
Assistant United States Attorney
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-5783
(216) 522-7499 (facsimile)
Kevin.pierce@usdoj.gov